WO

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Plump, et al., | No. CV-16-00505-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| David J Graham, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff Richard and Janine Plump's ("Plumps") and Defendant United States Army Corps of Engineers' ("Corps") respective motions for summary judgment, (Docs. 56, 71). For the following reasons, the Court grants the Corps' motion for summary judgment and denies the Plumps' motion.

## BACKGROUND

The United States Army Corps of Engineers ("Corps") is an agency within the United States Department of Defense entrusted with, among other things, managing the discharge of material, including concrete and natural soils, into the navigable waters of the United States, such as the Colorado River. (Doc. 57 at 2; Doc. 68 at 1, 2.) Generally, due to concern for the cumulative effects of multiple jetties on the Colorado River, the Corps does not permit the construction of new jetties, but the Corps will permit certain improvements to existing jetties. (Doc. 57 at 2; Doc. 68 at 2.) To remove any doubt whether improvements fall within the permissible scope, a landowner may apply for a permit or seek a "verification letter" from the Corps. There is no requirement, however,

that the landowner do so.  (Doc. 68 at 4–5.)

There is more than one type of permit; a landowner may seek a specialized permit, unique to his situation, or may qualify to use a pre-existing nationwide permit.  (Doc. 68 at 5.)  A nationwide permit categorically authorizes "certain activities that have minimal individual or cumulative adverse effects on the aquatic environment."  (Doc. 57 at 3; Doc. 68 at 6.)  Nationwide Permit No. 3 ("NWP 3") permits the "repair, rehabilitation, or replacement of any previously authorized, currently serviceable structure."  (Doc. 57 at 4; Doc. 68 at 6.)  While "minor deviations" from the original plans are authorized, a landowner may not use the NWP 3 if he is seeking to "put [the jetty] to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification."  (Doc. 57 at 4; Doc. 68 at 6.)

The Plumps own property on the banks of the Colorado River, "directly to the north of the Grahams' property."  (Doc. 57 at 11.)  In 1983, the previous owners of the Grahams' property constructed a jetty ("1983 Jetty") that extended into the Colorado River.  (Doc. 57 at 2; Doc. 68 at 3.)  By the time that the Grahams applied to renovate the 1983 Jetty, it was composed of dirt, rock, and vegetation.[1]  (Doc. 57 at 3; Doc. 68 at 3.)  The original measurements of the 1983 Jetty are disputed but the parties agree that in 2013 the Grahams' plans to renovate the jetty involved creating a new structure ("New Jetty") with an approximate height of 14 feet and a total width of 21 feet.  (Doc. 57 at 3, 5; Doc. 68 at 3–4, 7.)  The plans for the proposed renovations to the 1983 Jetty were approved by the Corps in 2013, as the Corps verified that the renovations complied with NWP 3.  (Doc. 57 at 5, Doc. 68 at 8.)

The Grahams altered their renovation plans in 2014.  (Doc. 57 at 5, Doc. 68 at 8.)  These alterations included abandoning the original sloped design of the 1983 Jetty in favor of a vertical wall.  (Doc. 57 at 5; Doc. 68 at 8.)  The Grahams submitted these

---

[1]  The Corps contends that although this was the 1983 Jetty's status in 2013, the Grahams indicated in their application to renovate the jetty that the dirt and vegetation were not original components of the jetty; rather, these components were the result of erosive forces. (Doc. 68 at 3.)  The Corps also alleges that the 1983 Jetty was filled with construction debris. (*Id.*)

updated plans to the Corps. (*Id.*) There is no evidence that the Grahams' modified plans ever led to a modification of the verification given by the Corps in 2013; however, several documents in the administrative record indicate that the Corps continued to find that the revised plans still complied with NWP 3. (Doc. 68 at 9.)

In September of 2014, the Grahams began demolishing the 1983 Jetty. (Doc. 57 at 6.) Beginning in October of 2014, the Plumps sent several emails and photographs to Corps Senior Project Manager, William Miller, to voice their concerns over the New Jetty. (Doc. 57 at 6–7; Doc. 68 at 10.) These concerns included the Plumps' opinions that the New Jetty: 1) moved several feet north in relation to the 1983 Jetty, 2) was significantly larger than the 1983 Jetty, 3) could not provide a home for wildlife, 4) contained drain pipes that were exposed at low tide, and 5) extended into the Plumps' property. (Doc. 57 at 7; Doc. 68 at 10.) On October 29, 2014, William Miller sent an email to the Grahams' architect requesting the plans of both the 1983 Jetty and the New Jetty. (Doc. 57 at 7; Doc. 68 at 11.) Mr. Miller indicated that he had a set of photos indicating that the New Jetty was much larger than the jetty as it currently existed, but that he also understood that pictures can be deceiving, and thus he requested "a set of drawings be submitted that allows [the Corps] to compare the previous structure with the new structure." (Administrative Record ("AR") at 169.) The Grahams provided updated drawings and the Corps confirmed that the New Jetty complied with NWP 3. (Doc. 68 at 22.) However, the Plumps continued to compose letters and emails to the Corps to voice their concerns over the New Jetty. (Doc. 57 at 6–9; Doc. 68 at 12–14.) These continued concerns led the Corps to conduct an in-person inspection of the New Jetty in November of 2014. (Doc. 68 at 23; AR at 273.) The Corps ultimately completed its investigation into the matter in February of 2015, and found that the New Jetty was permissible under NWP 3. (Doc 68 at 23; AR at 326.) The Corps summarized its findings in a Memorandum for the Record ("MFR"), specifically noting that the New Jetty "should be an improvement in terms of safety and stability." (Doc. 68 at 23; AR at 326.) The Corps related these findings to the Plumps in a letter soon after. (Doc. 68 at 24; AR at 336.)

The Plumps continued to voice their concerns even after this final communication from the Corps. (Doc. 57 at 10; Doc. 68 at 15.) The Plumps became particularly concerned that the New Jetty presented risks to swimmers, trapped debris in front of the Plumps' property, and caused soil to be washed away from the Plumps' land. (Doc. 57 at 10; Doc. 68 at 15.) In April, Mr. Plump composed a letter to the Corps reflecting these concerns, and emphasizing that he did not believe that the scouring effect of the New Jetty was considered before the New Jetty project received its permit. (Doc. 57 at 10; Doc. 68 at 16; AR at 347.) There is no evidence that the Corps ever responded to this letter. (Doc. 57 at 10; Doc. 68 at 16.)

The Plumps subsequently filed this lawsuit under the Administrative Procedure Act ("APA") to seek judicial review of the Corps' determination that the NWP 3 applied to the New Jetty. (Doc. 26 at 17.) The Plumps seek equitable relief in the form of an injunctive order compelling the Corps to revoke the NWP 3 approval of the New Jetty and a declaration that the Corps' actions in approving the New Jetty under NWP 3 were arbitrary and capricious. (*Id.* at 18.) Both parties filed motions for summary judgment. (Docs. 56, 71.)

## DISCUSSION

### I.    Standard of Review

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. "In reviewing an administrative agency decision, summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did." *City & Cty. of San Francisco v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) (internal citations and quotations omitted). District courts are "not required to resolve any facts in a review of an administrative proceeding," because fact finding is in the realm of duties delegated to the agency. *Occidental Eng'g Co. v. I.N.S.*, 753 F.2d 766, 769 (9th Cir. 1985). Rather, "the function of the district court is to determine whether or not as a

matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co.*, 753 F.2d at 769. In making this review, "the court shall review the whole [administrative] record."[2] *Id.*

Agency actions may be set aside if the agency's "action, findings, and conclusions" are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706. This is a very narrow standard, and courts must not substitute their judgment for that of the agency. *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 384 F.3d 1163, 1170 (9th Cir. 2004). However, courts may set aside an agency's finding if the agency fails to "articulate a rational connection between the facts found and the conclusions made." *Id.* (internal citations and quotations omitted). The United States Supreme Court has explained that an agency's determination is arbitrary and capricious where the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

/ / /

/ / /

---

[2] The Plumps hired a Certified Floodplain Manager and Geomorphologist to analyze the New Jetty's impact on the floodway and its scouring effect. (Doc. 57 at 11; Doc. 68 at 16.) However, his report is not part of the administrative record before the Court in this case, and therefore it will not be considered in this order. *See First Nat'l Bank & Trust, Wibaux, Mont. v. Dep't of Treasury, Comptroller of Currency*, 63 F.3d 894, 897 (9th Cir. 1995) ("Generally, judicial review of an agency decision is limited to the administrative record."). Further, as is explained in more detail below, to the extent that the Corps correctly determined that the new project was appropriately within the confines of NWP 3, the Corps was not required to undertake a complex public interest analysis including, presumably, a separate scour analysis analyzing the difference, if any, between the scour caused by the 1983 Jetty and the New Jetty.

## II.	Analysis

Pursuant to the Clean Water Act ("CWA") and the Rivers and Harbors Act of 1899, the Army Corps of Engineers issues permits for the discharge of fill or other materials into the navigable waters of the United States. 33 C.F.R. § 320.2.  There are two types of permits: individual permits and nationwide permits. Individual permits "authorize specific activities on a case-by-case basis," and are subject to an extensive vetting process under the National Environmental Policy Act ("NEPA").  *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Engineers*, 683 F.3d 1155, 1158 (9th Cir. 2012). Nationwide permits "are a type of general permit issued by the Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts" on the navigable waters of the United States.  33 C.F.R. § 330.1(b). Nationwide permits, unlike individual permits, undergo extensive vetting under NEPA "at the time the permit is promulgated, rather than at the time an applicant seeks to discharge fill material under such a permit." *Snoqualmie Valley Pres. All.*, 683 F.3d at 1158.

NWP 3 is a nationwide permit. Specifically, it permits the "repair, rehabilitation, or replacement" of any previously authorized and currently serviceable fill or structure, "provided that the structure or fill is not to be put to uses differing from those uses specified or contemplated for it in the original permit or the most recently authorized modification." Reissuance of Nationwide Permits, 77 Fed. Reg. 110184-01, 10,270 (Army Corp of Eng'rs Feb. 21, 2012).  Pursuant to NWP 3, "[m]inor deviations in the structure's configuration or filled area, including those due to changes in materials, construction techniques, or current construction codes or safety standards that are necessary to make the repair, rehabilitation, or replacement are authorized." *Id.*

"The verification decision at issue here involves a determination that the proposed activity falls within the parameters of the Corps' regulations enacting the nationwide permits."  *Snoqualmie Valley Pres. All.*, 683 F.3d at 1161.  Therefore, it is "an interpretation of its own regulations," and it is entitled to "controlling weight unless it is

1  plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Miller v. Cal.*
2  *Speedway Corp.,* 536 F.3d 1020, 1028 (9th Cir. 2008)).

**A.  The Corps Did Not Violate Section 706(2) By Neglecting to Require the New Jetty to Exactly Comply with the 1983 Jetty's Dimensions or by Finding that NWP 3 Authorized the Proposed 2014 Revisions.**

The Army Corps of Engineers notified the Grahams that their proposed renovations of the 1983 Jetty qualified for a national permit under NWP 3 on August 6, 2013 despite the fact that the proposed renovations would slightly shift the footprint of the 1983 Jetty's dimensions.  (AR 40, 332; Doc. 71 at 17.)  It is unclear exactly how large the 1983 Jetty was when it was originally created, because subsequent accumulation of soil and vegetation from the river, as well as impermissible dumping of construction materials, increased its size over the years.[3]  (Doc. 57 at 3; Doc. 68 at 4.)  However, the Corps' Nationwide Permit Verification Letter reflects that the Corps interpreted the original plans for the 1983 Jetty to indicate that the original jetty was "approximately 15 feet high."  (AR at 40; *see also* AR at 12 (illustration of the original 1983 Jetty, showing a height of 12 feet above the ordinary low water mark, with the footings being 3.5 feet below the ordinary low water mark.) (Doc. 68 at 3.)  Given these figures the Grahams' improvements to the jetty would result in a refurbished jetty that is approximately "same height as the original structure."  (AR 336.)  The New Jetty's highest point would be to the north of the 1983 Jetty, but the overlay of the two structures indicates that the New Jetty would fit largely within the same footprint as the 1983 Jetty. (Doc. 68 at 23; AR at 293.)  The New Jetty has the same exact length as the 1983 Jetty.

_____

[3]  In their reply, the Plumps allege, for the first time, that the Corps failed to compare the 1983 Jetty with the jetty as it existed in 2013 and the plans for the New Jetty.  (Doc. 84 at 3.)  First, this is simply incorrect, as the Corps included the 1983 permit in the administrative record, and did seemingly rely on the original permit to formulate its opinion as to the size of the 1983 Jetty, although it differed from the Plumps' interpretation.  (AR at 12.)  Second, neither party has submitted any pictures of the jetty as it existed in 1983, and thus the Corps relied on pictures of the jetty as it existed in 2013 because that is the evidence it had at its disposal.  Third, the Plumps provide no legal support for their assertion that the Corps was obligated to compare these three structures.  And finally, the Plumps raise this argument in their reply, and thus it is untimely. *See United States ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) ("It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers.").

The Plumps dispute these findings, asserting that the original height of the 1983 Jetty was only eight feet tall, not fifteen feet tall as the Corps found, and that the original width was twelve, not twenty feet. (Doc. 57 at 2.) They argue that the 1983 Jetty was quite a bit smaller than the Corps says it was and that the New Jetty authorized in 2013 reflected the increased height and width that the 1983 Jetty had gradually accumulated over the course of its existence prior to the 2013 approval (approximately seven additional feet in height and eight additional feet in width). The Plumps thus allege that the Corps erred both in their determinations about the size of the 1983 Jetty and in finding that the proposed revisions to the 1983 Jetty were minor deviations, and therefore the Corps' authorization under NWP 3 was arbitrary.

But, the Corps determination that the change in the size of the Grahams' jetty, if any existed, and the slight shift in the jetty's footprint constituted a "minor deviation" that posed no bar to the application of NWP 3 is within the discretion of the Corps, and may only be overturned if the determination was "plainly erroneous or inconsistent with the regulation." *Snoqualmie Valley Pres. All.*, 683 F.3d at 1161 (quoting *Miller v. Cal. Speedway Corp.,* 536 F.3d 1020, 1028 (9th Cir. 2008)).

The Corps' determination is "consistent with the regulation," and therefore the Plumps' argument fails. *Id.* at 1162. The Corps reviewed the design plans of the 1983 Jetty to determine that the change in size was minimal, if it existed at all.[4] It then relied on reports from a surveyor as well as design drawings submitted by the Grahams' architect to investigate the change in the footprint between the two structures and determine that the shift was a "minor deviation" as contemplated by NWP 3. (AR 198, 200, 280–285, 293.) The Corps also reviewed the pictures submitted by Mr. Plump and sent an inspector to the site to conduct an in-person review of the jetty. (AR 235.) Given these facts, the Plumps have failed to present evidence to support a finding that the Corps determination regarding the change in the jetty's size was clearly erroneous.

---

[4] Some of the design drawings indicate that there may be an eight inch change in height between the 1983 Jetty and the New Jetty. (AR 283.)

The Plumps also allege that the Corps actions violated the APA because it failed to explain why the minor deviations were necessary. However, "language in the regulatory history suggests that a general 'public safety' rationale suffices to bring a replacement project with minor deviations under this nationwide permit." *Snoqualmie Valley Pres. All.*, 683 F.3d at 1161–62. The administrative record in this case reflects that the Corps, through its investigations, found that "although Mr. Plump feels that the renovation has negatively impacted his property," the renovation "should be an improvement in terms of safety and stability." (AR. 326.) The record noted that over the years, the 1983 Jetty was illegally used as a dump site for "concrete, with rusted reinforcement bars, plastics, and metals." (AR 40.) The Corps ultimately determined that the New Jetty would eliminate these items from the structure, and be "more functional to users, and include lighting for safe navigation" of the river. (AR 336.) Therefore, contrary to the Plumps' assertions, the administrative record indicates that the Corps weighed public safety concerns during the approval process, and ultimately found that a public safety rationale justified bringing this project under NWP 3.

**B.    The Corps Adequately Evaluated the 2013 Permit Application and its Subsequent Design Change.**

The Corps did not conduct a full scale public review, and thus did not conduct an independent hydrology or scouring study, of the Grahams' proposed 2013 or 2014 renovations because it was not required to do so. Nationwide permits such as NWP 3 "are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1. The concept behind such permits is to essentially frontload the research and public interest considerations to ensure that qualifying projects can move forward efficiently, without bureaucratic backlog, once a nationwide permit for the activity in question is issued. *Id.*; *see also Snoqualmie Valley Pres. All.*, 683 F.3d at 1163 ("The purpose of this scheme is to enable the Corps to quickly reach determinations regarding activities that will have minimal environmental impacts"); *see also Sierra Club, Inc. v. Bostick*, 787 F.3d 1043, 1052 (10th Cir. 2015) ("As long as the proposed

activities were authorized by the nationwide permit, the Corps would have had little reason to conduct a second NEPA review when issuing the verification letters.").

Therefore, projects that qualify under a nationwide permit are not required to go through the intensive public interest analysis outlined in 33 C.F.R. § 320.4(a). Indeed, "[r]equiring an elaborate analysis of the applicable regulations and the facts would defeat" the purpose of nationwide permits. *Snoqualmie Valley Pres. All.*, 683 F.3d at 1163. As one district court in the Southern District of Alabama explained, because the nationwide permit is already in place, and was already subjected to intensive environmental review, "the Corps' heavy lifting for a verification request like Plains Southcap's (falling within that pre-cleared category of activities delineated by NWP 12) has already been done." *Mobile Baykeeper, Inc. v. U.S. Army Corps of Engineers*, No. CIV.A. 14-0032-WS-M, 2014 WL 5307850, at *14 (S.D. Ala. Oct. 16, 2014). At this point, the "only thing left to be done is for the Corps' district engineers to verify that the planned project does, in fact, fit within the category of activities that the Corps has already authorized." *Sierra Club* 990 at 27. In 2013, the Corps found that the Grahams' proposed renovations to the 1983 Jetty qualified under NWP 3, and thus it was not required to engage in the public interest analysis of 33 C.F.R. § 320.4(a).[5]

Likewise, the Plumps argument that the Corps had an obligation to independently perform a hydrology and scouring impact study on the New Jetty also fails. The Corps relied on drawings, satellite images, site visitations, and other research to conclude that the proposed renovations met the criteria of NWP 3. Once the Corps verified this compliance, it was absolved of any duty to perform an independent, full scale review of the New Jetty's impacts. The Corps determined that the New Jetty would have "same effects to water flow as the original structure," and thus complied with the terms of NWP 3. (AR 337; *see* AR 40 (verifying the project's compliance with NWP 3).)

---

[5] The Plaintiffs in this case continue to suggest that the Corps should have performed various reviews prior to "the issuance" of the permit under NWP 3. But, NWP 3 was already issued, and it had been since 2012. The Corps did not issue a permit to the Grahams; rather, it found that their renovations qualified under a pre-existing permit, namely NWP 3.

The Plumps also allege that the Corps acted arbitrarily in failing to exercise its discretion to revoke the NWP 3 authorization after the Grahams' altered their proposed revisions to the 1983 Jetty in 2014. Although the Corps "reserves the right (i.e., discretion) to modify, suspend, or revoke NWP authorization," there is no requirement that it do so. 33 C.F.R. § 330.4(e). The record reflects that the Corps reviewed the alterations made by the Grahams in their 2014 plans, specifically due to the concerns raised by the Plumps in their correspondence with Mr. Miller. (Doc. 68 at 23; AR at 336.) In their correspondence, the Plumps alleged that the New Jetty raised six major reasons for concern: 1) the New Jetty negatively impacted navigation for boaters, 2) the New Jetty negatively impacted aquatic life movements, 3) the New Jetty negatively impacted migratory bird breeding areas, 4) the New Jetty is made out of concrete rather than natural sources, 5) the New Jetty negatively impacted water flows, and 6) the Grahams failed to revegetate the New Jetty. (AR 264.) The Corps launched an investigation into the matter that spanned several months and involved an in-person inspection of the New Jetty in November of 2014. (Doc. 68 at 23; AR at 275.) After the investigation was completed, the Corps issued a detailed MFR to the Plumps to explain why each of the issues they raised in their November correspondence was not a legitimate reason to require the revocation of the Corps' NWP 3 authorization. (Doc. 68 at 23; AR at 336–37.) The Corps' investigation, and the subsequent findings summarized in the MFR, established that the Corps "articulate[d] a rational connection between the facts found and the conclusions made," and therefore its decision not to modify or revoke the NWP 3 authorization is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers*, 384 F.3d at 1170 (internal citation and quotations omitted). To the extent that the Plumps allege that the Corps decision not to revoke authorization under NWP 3 was arbitrary, summary judgment is granted for the Corps.

///

///

**C. The Corps Adequately Considered FEMA Regulations and Executive Orders 11988 and 11990.**

The Grahams' property is located on a floodplain, and as a result, it is generally subject to certain regulatory requirements. Executive Orders 11988 and 11990 require every agency of the United States government to consider the potential implications of its actions if it interferes with land on a floodplain. The Federal Emergency Management Agency ("FEMA") also requires federal executive agencies to "respond to a number of floodplain management and wetland protection responsibilities before carrying out any of their activities, including the provision of Federal financial and technical assistance." 44 C.F.R. § 9.17. However, as outlined above, NWP 3 went through a rigorous vetting process prior to its issuance in 2007, which included the limitation that "[i]f the proposed activity will result in more than minimal adverse effects to floodplains or increases in flood hazards, the district engineer will exercise discretionary authority and require an individual permit for the proposed activity." Reissuance of Nationwide Permits, 72 Fed. Reg. 11092-01, 11157 (March 12, 2007); *see also* Reissuance of Nationwide Permits, 77 Fed. Reg. 10184-01, 10,270 (indicating that no commenter raised concerns with NWP 3's treatment of floodplains). By virtue of verifying that the Grahams' jetty fell under the range of activities authorized under NWP 3, the Corps considered the impact the New Jetty would have on the flood plain and found them to be negligible. (*See* AR at 413 (explaining the limitations of NWP 3, "[t]he activities authorized by NWP 3 will have negligible adverse effects on the flood-holding capacity of the 100-year floodplain, since the NWP is limited to maintenance activities.").

The Corps' verification that a project is authorized under NWP 3 is also subject to the general conditions outlined in the Reissuance of Nationwide Permits, including General Condition 10 ("GC 10") which specifically considers the potential impact of the nationwide permits on floodplains. *See* Reissuance of Nationwide Permits, 77 Fed. Reg 10184-01, 10,283 (codifying GC 10 as "[t]he activity must comply with applicable FEMA-approved state or local floodplain management requirements"). However,

contrary to the Plumps' assertions, it is not the Corps' responsibility to ensure that the Grahams comply with FEMA's regulations or the general conditions contained in an NWP. *See Snoqualmie Valley Pres. All.*, 683 F.3d at 1164 ("The nationwide permit system is designed to streamline the permitting process. We decline to impose a new requirement of a full and thorough analysis of each general condition based on documentation the Corps may or may not have."). GC 10 "recognizes that FEMA, in partnership with state and local governments, is the more appropriate authority for floodplain management. It is not the responsibility of the Corps to ensure that project proponents seek any required authorizations from state or local floodplain managers." *Id.* Therefore, while GC 10 effectively puts a permittee on notice of the existence of FEMA regulations that he may be subject to, it also makes it clear that it is not the Corps' responsibility to ensure that the applicant follows through with FEMA and actually complies with its separate regulatory process. *Id.* Therefore, to the extent that the Plumps claim that the Corps acted arbitrarily by failing to coordinate with FEMA or ensure compliance with Executive Orders 11988 and 11990, summary judgment is granted for the Corps.

## CONCLUSION

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Given the administrative record in this case, the Corps did not act arbitrarily in determining that the Grahams' New Jetty complied with the requirements of NWP 3. Therefore, the Corps is entitled to summary judgment as to Count 1 of the Plumps' FAC.

**IT IS THEREFORE ORDERED** that the Corps' Motion for Summary Judgment, (Doc. 71), is **GRANTED**.

/ / /

/ / /

/ / /

**IT IS FURTHER ORDERED** that the Plumps' Motion for Partial Summary Judgment, (Doc. 56), is **DENIED**.

Dated this 9th day of May, 2017.


Honorable G. Murray Snow
United States District Judge